UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

BRENDA FREDERICK, individual and
on behalf of all others similarly situated,

    Plaintiff,

v.                                                          Case No. 3:19-cv-00418-PLR-HBG

CENTRAL FLORIDA
INVESTMENTS, INC.,
WESTGATE RESORTS, INC.,
WESTGATE MARKERTING, LLC,
AND DOES 1-50, inclusive,

    Defendants.

## PLAINTIFFS' UNOPPOSED MOTION FOR SETTLEMENT APPROVAL

### INTRODUCTION

Plaintiff Brenda Frederick, individually and on behalf of the FLSA Settlement Class ("Plaintiffs") and Defendants Central Florida Investments, Inc., Westgate Resorts, Inc., and Westgate Marketing, LLC ("Defendants") (collectively, the "Parties"), have reached a proposed settlement of Plaintiff's claims under the Fair Labor Standards Act ("FLSA"). As detailed below, the settlement and plan of distribution is a fair and reasonable resolution to a *bona fide* dispute between the parties.

Accordingly, Plaintiffs respectfully request that the Court issue an Order: (1) approving the Settlement Agreement as fair and reasonable; (2) approving the service payment to the Named

1

Plaintiff in the amount of $1,000.00; (3) approving the contingency/settlement fund in the amount of $2,000.00; and (4) dismissing this case with prejudice.[1]

## I. LITIGATION, DISCOVERY, AND SETTLEMENT

### A. Procedural History

Named Plaintiff Brenda Fredrick filed this action on October 23, 2019, alleging Defendants failed to properly pay her and other similarly situated individuals proper overtime compensation when they worked more than forty (40) hours a week under the FLSA. (Compl., ECF No. 1.) On December 17, 2019, each Defendant filed its Answer to the Complaint, denying the material allegations of the Complaint and asserting certain Additional and Affirmative Defenses. (Ans., ECF Nos. 26–29.) On June 22, 2020, the Parties filed their Joint Stipulation on Plaintiff's Request for Conditional Collective Certification Pursuant to 29 U.S.C. § 216(b), agreeing on the following collective class definition:

> Former and Current In-House or Dayline Sales Representatives who worked at Westgate's Smoky Mountain Resort & Spa in Tennessee from October 23, 2016 to present.

(Joint Stip. for Cond. Cert. of FLSA Collective, ECF No. 45.) On July 7, 2020, this Court granted conditional certification of the FLSA collective. (Order, ECF No. 46.) A total of 98 individuals opted into the lawsuit. (Srey Decl. ¶ 3.) Four (4) of the 98 individuals withdrew, and an additional 23 individuals are ineligible because their claim does not meet the collective definition. (*Id.*) Thus, with the Named Plaintiff, 72 Plaintiffs are included in this settlement. (*Id.*)

### B. Factual Background

Plaintiffs worked for Defendants as In-House or Dayline Sales Representatives ("sales reps") at Westgate's Smoky Mountain Resort & Spa in Tennessee. (Compl., ECF No. 1, ¶¶ 20,

---

[1] While Defendants continue to dispute the relevant facts, Defendants do not oppose this motion.

23.) Plaintiffs' primary job duty as sales reps was to sell fractional or interval real estate units or timeshares at Defendants' resort. (*Id.* ¶ 24.) As part of their duties, the sales reps participated in sales presentations on the resort's premises and provided tours to prospective customers with the goal of selling timeshare units. (*Id.* ¶ 25.) Plaintiffs allege that Defendants misclassified them as independent contractors even though they exercised direct and indirect control over the manner in which they performed their work. (*Id.* ¶ 26.) Further, Plaintiffs allege that Defendants did not pay an overtime premium for their hours worked over 40 in a workweek as a result of this misclassification. (*Id.* ¶¶ 44–45.) Defendants deny these allegations. (*See* Ans., ECF Nos. 26–29.) Specifically, Defendants claimed that Plaintiff was an independent contractor, not an employee, and therefore precluded from obtaining relief for alleged FLSA violations and that she has received all the compensation that was owed to her. (*Id.* at 7 (3d Affirmative Defense).)

### C. Discovery and Settlement Negotiations

Following the close of the notice period, the Parties engaged in written discovery. (Srey Decl. ¶ 4.) Specifically, Defendants served interrogatories and requests for the production of documents on Plaintiff Fredrick, to which Plaintiffs' counsel served her responses on September 2, 2020. (*Id.*) Plaintiffs then served their interrogatories, requests for the production of documents, and Notice of Rule 30(b)(6) Deposition on Defendants on the same date. (*Id.*) In pertinent part, Plaintiffs requested from Defendants their personnel files, payroll records, and any documents or records that reflected the times that Plaintiffs performed work activities. (*Id.*) Defendants provided their responses, including these requested documents, for all Plaintiffs on a rolling basis from approximately October 16, 2020 through January 21, 2021. (*Id.*)

Defendants' payroll data showed Plaintiffs' pay during the relevant statutory period, and Defendants' daily attendance logs showed the number of hours recorded per day for each Plaintiff

during the relevant statutory period. (*Id.* ¶ 5.) Defendants' payroll data confirmed that Defendants paid time-and-a-half for the recorded overtime hours worked from the daily attendance logs, which was contrary to Plaintiffs' belief that they were not paid overtime premiums for any overtime hours worked. (*Id.*) However, the data also revealed underpayments of overtime and minimum wages during certain workweeks within the statutory period, but the amounts of underpayment were relatively small. (*Id.*) To determine whether the daily attendance logs recorded all hours worked, Plaintiffs' Counsel then presented these records to Named Plaintiff Fredrick and a sample of Opt-in Plaintiffs and interviewed them to evaluate the accuracy of the recorded hours in the daily attendance logs. (*Id.*) The majority of Plaintiffs who reviewed their daily attendance logs confirmed that they accurately captured all hours worked on-premises. (*Id.*) Several Plaintiffs, however, alleged that they worked off-the-clock on a handful of occasions. (*Id.*)

In approximately February 2021, the Parties began informal settlement discussions with Plaintiffs providing Defendants a settlement demand. (*Id.* ¶ 6.) Subsequently, on March 19, 2021, the Parties filed a joint motion to stay the Court's Scheduling Order deadlines in order to continue settlement discussions, which the Court granted. (Jt. Mot., ECF No. 81; Order, ECF No. 82.) The parties thereafter continued informal settlement negotiations, culminating in the present Settlement Agreement, attached hereto as Exhibit 1. (Srey Decl. ¶ 6.)

## II. EXPLANATION OF THE SETTLEMENT

### A. Settlement Amount and Allocation of Settlement Funds

Defendants will pay Plaintiffs a total settlement amount of $34,500.00 ("Gross Settlement Amount"). The Gross Settlement Amount includes all settlement amounts to all Settling Plaintiffs, a service payment to the Named Plaintiff Brenda Fredrick, and a contingency/settlement administration fund. (Ex. 1, Settlement Agreement ¶¶ 3–4.) Plaintiffs' Counsel shall separately

4

apply for an award of attorneys' fees and costs, and Defendants have a right to respond to Plaintiffs' request. (*Id.* ¶ 1.)

Plaintiffs' Counsel requests the Court to allocate a service payment of $1,000.00 from the Gross Settlement Amount (approximately 2.9%) to Named Plaintiff Fredrick for the time and effort incurred in bringing this lawsuit and securing the settlement. (*Id.* ¶ 3.) Plaintiffs' Counsel also requests $2,000.00 as a contingency/settlement administration fund used to effectuate the purposes of settlement. (*Id.*)

The Settlement Agreement sets forth that each Plaintiff will receive their settlement payment via one settlement check. (*Id.* at ¶ 6.) Each check is to be reported on an IRS 1099 form. (*Id.*)

No amount of the Gross Settlement Amount will revert to Defendants. Instead, if there is any residual amount of the settlement fund remaining after distribution or any uncashed checks, and the remaining balance exceeds $1,000.00, the funds will be reallocated to the settling Plaintiffs on a *pro rata* basis. (*Id.* at ¶ 8.) If the remaining funds amount to less than $1,000.00, those funds shall be paid to a nonprofit tax-exempt charitable organization organized under Section 501(c)(3) of the Internal Revenue Code chosen by Plaintiffs' Counsel. (*Id.*)

### B. Allocation Formula

Plaintiffs' Counsel calculated a reasonable allocation of the settlement amounts among the Plaintiffs. As explained above, these allocations were based on Plaintiffs' Counsel's review of the payroll data and daily attendance logs data to identify minimum wage and overtime pay violations. In addition, Plaintiffs' Counsel interviewed a sample of Plaintiffs to determine that most Plaintiffs believed that their daily attendance logs recorded all hours worked, while a minority of Plaintiffs believed that they occasionally worked unrecorded overtime hours.

5

After the payment of the Named Plaintiff service payment and the contingency/settlement fund, the amount allocated from the Gross Settlement Amount to all Plaintiffs included in the scope of the settlement is the "Net Allocation Fund." (Ex. 1, Settlement Agreement ¶ 4.) Each Plaintiff's share of the Net Settlement Fund is a *pro rata* amount calculated based on their dates of employment in an eligible position, the date they joined the action by filing a written consent with the Court, payroll and time data provided by Defendants for the relevant time period, and an assumed amount of off-the-clock work per eligible workweek. (*Id.*) First, Plaintiffs' Counsel used a three-year statute of limitations for each Plaintiff based on the date that they filed their consent form with the Court. (Srey Decl. ¶ 7.) For each workweek within the eligible statutory period, Plaintiffs' Counsel added weekly recorded hours from Defendants' attendance logs and an assumed two off-the-clock hours (based on interviews with Plaintiffs about their good-faith estimates of weekly unrecorded work hours) to determine adjusted weekly hours. (*Id.*) Then, Plaintiffs' Counsel divided each Plaintiff's weekly pay from Defendants' payroll data by the adjusted weekly hours to determine the regular rate of pay. (*Id.*) For workweeks in which the regular rate of pay was less than the federal minimum wage rate of $7.25 per hour, Plaintiffs' Counsel determined minimum wage loss by subtracting the regular rate from $7.25 and multiplying that figure by the adjusted weekly hours. (*Id.*) For workweeks in which Plaintiffs worked more than 40 hours, Plaintiff's Counsel calculated the applicable overtime premium by multiplying the regular rate of pay by one-half, and then Plaintiff's Counsel multiplied this overtime premium by the number of overtime hours each week to determine overtime wage loss. (*Id.*) After the total minimum wage and overtime wage loss figures were tallied, each Plaintiff was allocated their *pro rata* share of the Net Settlement Fund. (*Id.*) Finally, Plaintiffs' Counsel applied a $50.00 minimum payment for each Plaintiff in the settlement class. (*Id.*)

The resultant settlement offers to each Plaintiff represents approximately over 60% of their liquidated minimum wage and/or overtime damages, assuming they each worked two unreported hours (which Defendants dispute they did), and each Plaintiff received the minimum $50.00 payment. (*Id.*)

### C. Notice of Settlement and Opportunity to Reject

On September 7, 2021, Plaintiffs' Counsel distributed a Settlement Notice ("Notice") via U.S. Mail and email to Plaintiffs. (Srey Decl. ¶ 8.) The Notice, attached hereto as Exhibit 2, informs each Plaintiff of the terms of the settlement. (Ex. 2.) Specifically, the Notice informs Plaintiffs of the terms of the settlement and their individual settlement allocation. (*Id.*) The Notice also describes Plaintiffs' Counsel's data analysis and informs Plaintiffs of the methodology underlying the allocation. (*Id.*) The Notice also outlines the release of claims that is part of the settlement. (*Id.*)

The Notice advises Plaintiffs of their options in the settlement. (*Id.*) Each Plaintiff has thirty (30) days to accept or reject their individual settlement offer by doing nothing ("Settling Plaintiff") to accept or providing written notice to Plaintiffs' Counsel to reject ("Rejecter"). (Ex. 1, Settlement Agreement ¶ 5.) Rejecters will be dismissed without prejudice and will have thirty (30) days from the Court's approval of the settlement within which to file a subsequent FLSA claim should they choose to do so. (*Id.*) Rejecters will not be bound by the release described below, *infra* Section I.D. (*Id.*)

### D. Released Claims

As explained in the Settlement Agreement and the Notice, Settling Plaintiffs will release Defendants from any known and unknown claims for overtime compensation, minimum wages, liquidated damages, attorneys' fees, penalties, and interest under the FLSA, 29 U.S.C. § 201, *et*

7

*seq.*, arising from the facts alleged in the Complaint for the period commencing on October 23, 2016 up to June 15, 2021. (*Id.* ¶ 9.)

## ARGUMENT

### I. THE COURT SHOULD APPROVE THE FLSA SETTLEMENT AS FAIR AND REASONABLE.

The Parties have reached a settlement agreement, and notice of the settlement has been distributed to the Plaintiffs. Each settlement offer represents good value for Plaintiffs' claims, because it compensates them for minimum wage and overtime violations that are apparent from Defendants' payroll and time records, as well as an additional amount for unrecorded overtime hours and percentage of their liquidated damages under the FLSA; each Plaintiff also received a minimum $50.00 payment. As a result, no Plaintiff rejected their individual settlement offer. The settlement fairly and reasonably resolves the Parties' claims and defenses, and the Court should enter an order granting approval of the settlement.

#### A. Applicable Legal Standard

The FLSA provides that "[a]ny employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee . . . affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be." 29 U.S.C. § 216(b). The FLSA's pay requirements are mandatory and, except in two narrow circumstances, employees' rights under the FLSA are generally not subject to waiver by contract or settlement. *Thompson v. United Stone, LLC*, No. 1:14-CV-224, 2015 WL 867988, at *1 (E.D. Tenn. Mar. 2, 2015) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945)). One such circumstance, like in the present matter, is when a court reviews and approves a settlement in a private action for back wages. *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982)

In approving a FLSA settlement, the Court must ensure that there is a fair and reasonable resolution of a *bona fide* dispute. *Id.* at 1354–55 (finding that FLSA settlements must "reflect a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching"); *Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).[2]

The Sixth Circuit's standard of evaluation of the fairness and reasonableness of a class settlement requires courts to balance several factors: (1) the likelihood of success on the merits; (2) the risk of fraud or collusion; (3) the complexity, expense and likely duration of the litigation; (4) the amount of discovery engaged in by the parties; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886, 894–95 (6th Cir. 2019) (quotations omitted) (citing *Int'l Union*, 497 F.3d at 631). There is a strong presumption in favor of settlement agreements, and they are a preferred method of resolving class actions. *Int'l Union,* 497 F.3d at 632.

Courts routinely apply a one-step approval process to FLSA settlements. *See Osman v. Grube, Inc.*, No. 3:16-CV-00802-JJH, 2018 WL 2095172, at *2 (N.D. Ohio May 4, 2018) (citing *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15-cv-10447, 2016 WL 7018566 (N.D. Ill. Nov. 29,

---

[2] Although this case involves a FLSA collective action under section 216(b), cases analyzing settlement approvals under Rule 23(e) are equally applicable here because Rule 23 also contains the requirement that the terms of a FLSA settlement be fair and reasonable. *See Kritzer v. Safelite Sols., LLC*, No. 10-CV-729 GLF, 2012 WL 1945144, at *5 (S.D. Ohio May 30, 2012) ("The Court's role in approving a settlement of a FLSA collective action 'is comparable to that of a court in a settlement of a class action brought pursuant to Fed. R. Civ. P. 23.'" (citation omitted)); *Hoffman v. First Student, Inc.*, No. 06-CV-1882 WDQ, 2010 WL 1176641, at *2 (D. Md. March 23, 2010) (citing *Lynn Foods* and acknowledging that because FLSA settlements must be approved by the court, various federal courts have analogized to the fairness factors generally considered for court approval of class action settlements under Rule 23(e) for FLSA collective action settlements).

2016) (stating that "[a] one-step settlement approval process is appropriate in FLSA settlements")). Because FLSA collective action members must affirmatively opt-in to the case, approval of FLSA settlements does not implicate the same due process concerns as approval of Rule 23 class action settlements. *See id.* Therefore, the Court here should provide final approval of this FLSA settlement in one step.

### B.  This FLSA Settlement Is a Compromise of a *Bona Fide* Dispute

Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes. *See Lynn's Food Stores*, 679 F.2d at 1353 n.8; *Kritzer*, 2012 WL 1945114, at *5. A *bona fide* dispute exists "when an employee makes a claim that he or she is entitled to overtime payment," and when settlement requires resolution of the overtime payment due. *Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 08-CV-1310 AJT JFA, 2009 WL 3094955, at *16–17 (E.D. Va. Sept. 28, 2009).

Here, the settlement is a compromise over numerous issues, warranting approval. Plaintiffs alleged that Defendants did not compensate them for all of their overtime hours worked because of their classification as independent contractors exempt from overtime pay. Defendants deny these allegations and argue that Plaintiffs were properly compensated under the FLSA. Upon review of Defendants' payroll data and attendance logs, Plaintiffs discovered that Defendants did pay time-and-a-half for some overtime hours worked; however, the data revealed underpayments of overtime wages during certain workweeks including weeks in which Plaintiffs alleged they worked unrecorded hours, as well underpayments of minimum wages during certain workweeks, within the statutory period. Moreover, some Plaintiffs also contend that they worked additional unrecorded overtime hours that were not captured in Defendants' daily attendance logs, which Defendants also deny. In addition to the merits, Plaintiffs face the additional risk regarding the

10

Case 3:19-cv-00418-CEA-JEM   Document 88   Filed 10/11/21   Page 10 of 19
PageID #: 372

limitations period. Defendants contend that any FLSA violations were not willful, and thus a two-year, rather than three-year, statutory period is applicable.

Although both Parties continue to firmly believe in the merits of their respective claims and defenses, given the time and expenses associated with continued litigation, and the uncertainty of dispositive motion practice and trial, the Parties reached a settlement after extensive arm's length negotiations that spanned over several months. They desire to resolve this case by way of a negotiated settlement payment by Defendants in exchange for release of claims by Settling Plaintiffs in order to avoid the time and expense inherent in continued litigation. Here, Plaintiffs will receive over 60% of their liquidated minimum wage and/or overtime damages, and at least a $50.00 minimum payment, in exchange for a limited release of claims relating to any minimum wage, overtime pay, liquidated damages, penalties, interest, and attorneys' fees claims under the FLSA only. Accordingly, this matter is indeed a *bona fide* dispute between Plaintiffs and Defendants.

### C. The FLSA Settlement Is Fair and Reasonable and Not a Result of Employer Overreach

At the core of *Lynn's Food* is the concept that FLSA settlements must "reflect a reasonable compromise of disputed issues [rather] than a mere waiver of statutory rights brought about by an employer's overreaching." *Lynn's Food Stores*, 679 F.2d at 1354. *Lynn's Foods* involved an employer who abandoned its negotiations with the Department of Labor and on its own convinced fourteen employees to split a $1,000 settlement amount in exchange for a release of over $10,000 in claims. *Id.* at 1352. Here, this settlement is far from an employer overreach, and an analysis of the seven factors listed above demonstrates the settlement is fair and reasonable.

#### 1. The Likelihood of Success on the Merits

The most important factor to be considered is "the probability of success on the merits" as weighed against the recovery provided by the settlement. *Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886, 894–95 (6th Cir. 2019). Here, Plaintiffs believe that if litigation were to continue, they would have prevailed on their claims considering Defendants' payroll data confirmed underpayment of minimum wages and overtime pay. However, Defendants dispute liability and contend that Plaintiffs were properly classified and compensated for all of their hours worked. Beyond the issue of liability, derivative issues also face challenges. While Plaintiffs claim that these violations were willful and in bad faith, Defendants assert otherwise. And, while Defendants stipulated to conditional certification of the FLSA collective, Defendants may have moved for decertification of the collective after discovery, arguing that Plaintiffs are not similarly situated for purposes of trial. Moreover, even before this motion practice, the Parties had significant discovery remaining to conduct, including additional written discovery (whether on a representative basis that Plaintiffs believe is appropriate or on an individualized basis across all Plaintiffs as Defendants believe is appropriate) and depositions. Given the risks and delay inherent in litigation, both on the merits and damages, this factor supports approval of the settlement.

### 2. *The Risk of Fraud or Collusion*

Here, the settlement was the result of intensive, arm's length negotiations between experienced attorneys who have extensive class action wage-and-hour litigation experience and who have knowledge of the legal and factual issues of this case in particular. The Parties' respective counsel is experienced in the litigation, certification, trial, and settlement of wage-and-hour cases, including actions similar to this case. The settlement in this case was reached only after discovery, including interrogatories and requests for the production of documents. As explained above, the settlement represents good value for Plaintiffs' claims. The settlement offers

represent approximately over 60% of their liquidated minimum wage and/or overtime damages assuming they each worked two unreported hours, and each eligible Plaintiff received a minimum $50.00 payment. There is no evidence collusion among the Parties. This factor therefore supports approval of the settlement.

### 3. *The Complexity, Expense and Likely Duration of the Litigation*

The Parties agree that the settlement represents a good value given the risks of continued litigation. If the litigation were to continue, Plaintiffs would face risks before trial that could have limited, or even eliminated their claims, including possible decertification, diminishing Plaintiffs' estimates of the hours they worked, and dispositive motions on liability, liquidated damages, and willfulness. Because many of the contested issues are fact-intensive, it is very possible the case would not be resolved on summary judgment, meaning liability and damages would be resolved at trial. Wage and hour trials are complex, expensive, and unpredictable. As explained above, additional written discovery and depositions loomed in this case – as well as likely motion practice on whether discovery on a representative basis or an individualized is suitable for this FLSA collective action. Significant motion practice relating to liability, the pertinent statute of limitations, and final certification and/or decertification of the FLSA collective remains. Absent this settlement, payment for Plaintiffs may have been uncertain and would have taken much longer. *See Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 246 (S.D. Ohio 1991) (finding that settlement provided an immediate value to the class and minimized the costs which plaintiffs would incur in moving forward). Such expense and complexity favor approval of the settlement.

### 4. *The Amount of Discovery Engaged In By the Parties*

13

As described above, the Parties participated in written discovery, and Defendants provided data regarding Plaintiffs' personnel files and pay data. This data was used to calculate damages for all Plaintiffs. The parties engaged in arms-length negotiations with the benefit of plenty of evidence on which to weigh the strengths and weaknesses of the case, and with data necessary to calculate damages. Plaintiffs' Counsel investigated Defendants' payroll and time records to determine whether Plaintiffs were compensated an overtime premium for their overtime hours worked and reflected the extent of minimum wage and overtime pay owing to Plaintiffs based on Defendants' miscalculations in their pay and time data. Moreover, Plaintiffs' Counsel interviewed their clients to confirm the accuracy of Defendants' time records and because some Plaintiffs alleged that their time records were inaccurate, Plaintiffs' Counsel negotiated a settlement that included two unrecorded work hours per eligible workweek. This amount of discovery – which identified FLSA violations from Defendants' data and identified any unrecorded overtime hours from Plaintiffs' good-faith estimates – supports the finding that the settlement is fair and reasonable. *See Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (noting that substantial formal discovery is not required for class action settlement approval); *Duprey v. Scotts Co. LLC*, 30 F. Supp. 3d 404, 409 (D. Md. 2014) (noting in approval of an FLSA settlement that "[b]y avoiding formal discovery, resources that otherwise would have been consumed by the litigation were made available for settlement, and the risk and uncertainties for both parties were reduced"); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013) ("Here, through an efficient, informal exchange of information, Plaintiffs obtained sufficient discovery to weigh the strengths and weaknesses of their claims and to accurately estimate the damages at issue.").

### 5. *The Opinions of Class Counsel and Class Representatives*

Plaintiffs' Counsel is a qualified firm with extensive experience in class action and wage and hour litigation. Nichols Kaster, PLLP has been in existence for over thirty years and is focused on advocating for employee and consumer rights. (Srey Decl. ¶ 9; *see also* Ex. 3, Nichols Kaster Firm Resume.) Nichols Kaster has represented thousands of employees in hundreds of cases and recently received a first tiered ranking on the 2021 Best Law Firms List in Minneapolis for Litigation-Labor and Employment by U.S. News-Best Lawyers "Best Law Firms." (*Id.*) Plaintiffs' Counsel agrees that the settlement is fundamentally fair, adequate, and reasonable. This settlement agreement is the result of arms-length negotiations, between experienced counsel representing the interests of Plaintiffs and Defendants and thorough factual and legal investigations. Plaintiffs' Counsel believes that this settlement is good value for Plaintiffs' claims, considering that the settlement provides each Plaintiff significant value for their minimum wage and overtime claims, partially liquidated, and presumes 2 hours of off-the-clock work per eligible workweek despite Defendants' claim that there were no unreported hours and only a handful of the sampled Plaintiffs claimed that Defendants' records were inaccurate. (Srey Decl. ¶ 10.) This factor therefore supports approval of the settlement.

### 6. *The Reaction of Plaintiffs*

Each Plaintiff was given the opportunity to reject the settlement offer in writing or accept it by doing nothing. No Plaintiff has rejected the settlement. (Srey Decl. ¶ 11.) This factor supports approval of the settlement.

### 7. *The Public Interest*

The Sixth Circuit has found that settlements support the public interest when they put an end to potentially long and protracted litigation, as well as help mandate long-term structural changes to employers' business practices so that workers receive appropriate wage and legal

15

Case 3:19-cv-00418-CEA-JEM   Document 88   Filed 10/11/21   Page 15 of 19
PageID #: 377

protections. *Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886, 899 (6th Cir. 2019). Here, this settlement ends a potentially complex litigation process and encourages companies to ensure that its workers are paid in accordance with the laws governing employment. *See id.* This factor therefore supports approval of the settlement.

## II. THE COURT SHOULD APPROVE THE NAMED PLAINTIFF SERVICE PAYMENT

The Settlement Agreement provides for a Named Plaintiff service payment of $1,000.00. The Sixth Circuit has recognized that service payments are a way of "encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Hadix v. Johnson*, 322 F.3d 885, 897 (6th Cir. 2003). "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of class litigation." *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D. Ohio 1997); *see also Salinas v. U.S. Xpress Enterprises, Inc.*, No. 13-CV-245 TRM SKL, 2018 WL 1477127, at *10 (E.D. Tenn. Mar. 8, 2018), *report and recommendation adopted*, No. 13-CV-245, 2018 WL 1475610 (E.D. Tenn. Mar. 26, 2018) (approving service awards to named plaintiff for the risk he incurred and rewarding him for his public service of contributing to the enforcement of mandatory laws). Such compensation is justified for the time, effort, risk, and service named plaintiffs expended beyond other class members in assisting counsel with the litigation.

Named Plaintiff Fredrick brought this action on behalf of other sales reps who allege that they were not properly compensated for all hours worked. She contributed to the lawsuit by initiating the litigation, responding to Plaintiffs' Counsel's questions, and responding to written discovery including interrogatories and requests for the production of documents. (Srey Decl. ¶ 12.) The service payment appropriately compensates the Named Plaintiff for her time and effort protecting the interests of the collective and contributing to the litigation process.

16

In addition to the Named Plaintiff's efforts in the litigation that directly benefited the class members, the requested service payment is also reasonable given its modest size, and the award does not significantly reduce the amount of settlement funds available to the remaining Plaintiffs. Awards like this also advance public policy by encouraging other individuals to come forward to protect the rights of others in representative actions and are in line with those approved by courts in this circuit and in similar cases. *See, e.g.*, Order, ECF No. 71, *Joseph v. DisplayMax, Inc.*, No. 2:19-cv-12872 (E.D. Mich. Apr. 14, 2021) (approving a service award for each named plaintiff that was equivalent to 2% of the net settlement amount) (Exhibit 4); *Alloways v. Cruise Web, Inc.*, CV CBD-17-2811, 2019 WL 1902813, at *14 (D. Md. Apr. 29, 2019) (approving a $1,000 per named plaintiff inventive award when the net settlement amount was $28,000). As such, the requested service payment is reasonable and should be approved.

## CONCLUSION

This settlement is the product of extensive arm's-length negotiation between counsel, which fairly and reasonably resolves a *bona fide* dispute over unpaid overtime wages. The proposed Settlement Agreement satisfied the criteria set by the Sixth Circuit. For these reasons and those set forth above, the Parties jointly and respectfully request that this Court approve the Parties' Settlement Agreement and dismiss this case with prejudice.

Dated: October 11, 2021

Respectfully submitted,

**NICHOLS KASTER, PLLP**

s/ *Rachhana T. Srey*_____
Rachhana T. Srey, MN Bar # 340133*
Caroline E. Bressman, MN Bar # 0400013*
NICHOLS KASTER, PLLP

17

4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
srey@nka.com
cbressman@nka.com

Bryce W. Ashby, TN Bar # 26179*
DONATI LAW, PLLC
1545 Union Avenue
Memphis, TN 38104
Phone: 901-278-1004
Fax: 901-278-3111
bryce@donatilaw.com

D. Alexander Burkhalter, III, TN Bar #004771
THE BURKHALTER LAW FIRM, P.C.
P.O. Box 2777
Knoxville, TN 37901
Telephone: (865) 524-4974
Facsimile: (865) 524-0172
www.burkhalterlaw.com

* Admitted *Pro Hac Vice*

Attorneys for Plaintiff and the FLSA Collective

.

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Plaintiffs' Unopposed Motion for Settlement Approval was filed electronically through the CM/ECF system on October 11, 2021. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/ Rachhana T. Srey*
Rachhana T. Srey
